ATTORNEY DISCIPLINARY PROCEEDINGS
 

 PER CURIAM.
 

 | iThis disciplinary matter arises from formal charges filed by the Office of Disci
 
 *646
 
 plinary Counsel (“ODC”) against respondent, Leonard E. Yokum, Jr., an attorney-licensed to practice law in Louisiana but currently on interim suspension for threat of harm to the public.
 
 In re: Yokum,
 
 09-0213 (La.2/4/09), 999 So.2d 1129.
 

 UNDERLYING FACTS
 

 Count I
 
 — The
 
 Anthony Matter
 

 In February 2006, Beverly Anthony retained respondent to handle a personal injury matter arising out of an automobile accident in which her minor son was injured. In February 2007, respondent settled the claim for $85,000 and withheld $23,677.80 from the settlement to pay his client’s medical expenses. However, respondent did not remit these funds to the medical providers until October 2007, after a complaint was lodged with the ODC and after Ms. Anthony had filed a lawsuit against him. During the interim, the balance of respondent’s client trust account dropped below the amount he was holding to pay the medical providers. Respondent also failed to respond to repeated inquiries from Ms. Anthony concerning the invoices she received from her son’s medical providers after the settlement was negotiated.
 

 | /The ODC alleges respondent violated Rules 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), 1.15(d) (failure to promptly deliver funds owed to a client or third person), 8.4(a) (violation of the Rules of Professional Conduct), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct.
 

 Count II
 
 — The
 
 Albin Matter
 

 In November 2006, Bobby and Linda Albin retained respondent to represent them in a judgment debtor examination scheduled for December 6, 2006. The Al-bins paid respondent $2,000 to handle this matter. By agreement of respondent and opposing counsel, the December 6th proceeding was continued, to be reset at a later date. However, because respondent had not enrolled as counsel of record on behalf of his clients, he did not receive notice of the rescheduled hearing date of March 12, 2007. Respondent then failed to appear in court on March 12th, leaving the Albins unrepresented.
 

 Following the hearing, the Albins requested that respondent refund the attorney’s fees they paid. Respondent refused to do so, and in August 2007, the Albins filed a complaint with the ODC. During the ODC’s investigation, respondent wrote a check to the Albins refunding half of their fee, in exchange for which they signed a letter at his request purporting to withdraw their disciplinary complaint. The notation on the check indicated that this sum represented the settlement of “all claims” against respondent. Respondent did not provide the Albins an opportunity to seek the advice of independent counsel in connection with this settlement.
 

 The ODC alleges respondent violated Rules 1.3, 1.4, 1.8(h) (a lawyer shall knot settle a malpractice claim with an unrepresented client unless the client is advised in writing to seek the advice of independent legal counsel), and 8.4(a) of the Rules of Professional Conduct.
 

 Count III
 
 — The
 
 Arbo Matter
 

 In May 2006, Diane Arbo retained respondent to handle her mother’s succession. Ms. Arbo paid respondent $1,500 to handle this matter. Respondent did some work on the succession, but he did not complete it and failed to communicate -with Ms. Arbo or return her telephone calls. In March 2007, Ms. Arbo discharged respondent and requested a refund of the attorney’s fees she paid. Respondent refused to do so, and in February 2008, Ms.
 
 *647
 
 Arbo filed a complaint with the ODC. During the ODC’s investigation, respondent wrote a check to Ms. Arbo refunding half of her fee, in exchange for which she signed a letter at his request purporting to withdraw her disciplinary complaint. The notation on the check indicated that this sum represented payment in full of “all claims” against respondent. Respondent did not provide Ms. Arbo an opportunity to seek the advice of independent counsel in connection with this settlement.
 

 The ODC alleges respondent violated Rules 1.3, 1.4, 1.8(h), and 8.4(a) of the Rules of Professional Conduct.
 

 Count TV
 
 — The
 
 Overton Matter
 

 Respondent was retained to represent John H. Overton, M.D., the executor of the succession of his brother, Morris Overton. In his capacity as the attorney for the executor, respondent opened a succession checking account with First American Bank and Trust on which he was the sole signatory. Thereafter, in 2005, respondent obtained a personal loan from First American Bank and pledged the Overton succession account as collateral to secure the loan. Dr. Overton was not informed of the pledge of the succession funds, nor was he provided an ^opportunity to seek the advice of independent counsel in connection with the transaction.
 

 The ODC alleges respondent violated Rules 1.8(a) (a lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client), 8.4(a), and 8.4(c) of the Rules of Professional Conduct.
 

 Count V
 
 — The
 
 Angela Spiers Matter
 

 In 2003, respondent began representing Angela Spiers, handling several legal matters for her personally and for Extreme Auto Mart, Inc., a corporation in which respondent and Ms. Spiers had an interest.
 
 [1]
 
 During the representation, respondent and Ms. Spiers began a consensual sexual relationship. Ms. Spiers also managed respondent’s law office during this time. Respondent did not withdraw from representing Ms. Spiers or Extreme Auto Mart in any cases after their sexual relationship began.
 

 The ODC alleges respondent violated Rules 1.7(a) (conflict of interest) and 8.4(a) of the Rules of Professional Conduct.
 

 Count VI
 
 — The
 
 Emilie Yokum Matter
 

 Respondent performed the legal work for the succession of his mother, Emilie Yokum, who died intestate in June 2001. Mrs. Yokum was predeceased by her husband and survived by respondent and his brother, Albert Yokum, a resident of New York.
 

 | sIn 1995, Albert executed a power of attorney granting respondent the authority to act on his behalf to “mortgage any and all property owned by [Albert] situated in Tangipahoa Parish, Louisiana, in any amount deemed necessary by [respondent] ...” The power of attorney allowed respondent to sign any documents necessary for the mortgage transaction “and to do all other acts necessary and incidental in the premises ...” Albert did not revoke the 1995 power of attorney after this mortgage transaction was completed.
 

 Several years later, in March 2003, respondent mortgaged two lots in Tangipa-hoa Parish which were part of the sucees
 
 *648
 
 sion of his mother and in which he and Albert owned an undivided interest. Respondent did not inform Albert of this transaction, nor did he disclose to Albert that he had signed his name to a new power of attorney which was used to obtain the mortgage. Respondent asserted that he had the authority to sign Albert’s name to the 2003 power of attorney pursuant to the authority granted by the 1995 power of attorney.
 

 The ODC alleges respondent violated Rule 8.4(c) of the Rules of Professional Conduct.
 
 [2]
 

 Count VII
 
 — The
 
 Rubye Yokum Matter
 

 This count of the formal charges relates to respondent’s handling of the succession of his grandmother, Rubye Yokum, who died in 1973. The hearing committee concluded that the ODC did not prove the alleged misconduct by clear and convincing evidence, and the disciplinary board agreed with this finding. The ODC’s brief in this court does not object to this portion of the board’s recommendation, and accordingly, Count VII is not discussed herein.
 

 |
 
 RCounb VIII
 
 — The
 
 Peterman Matter
 

 Gerald Peterman retained respondent to perform title research on immovable property he owned in Tangipahoa Parish. Thereafter, Mr. Peterman used the property as collateral for a bank loan. Respondent handled the loan closing on June 18, 2007. As part of the closing, respondent issued a title insurance policy in favor of the lender. The ODC alleges respondent issued the policy after his license to write title insurance lapsed (see Count X, infra), thereby violating Rules 8.4(a), 8.4(b) (commission of a criminal act reflecting adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer), and 8.4(c) of the Rules of Professional Conduct.
 
 [3]
 

 Count IX
 
 — The
 
 Delaney Matter
 

 In June 2000, respondent was retained to represent Louis Delaney, the executor of the succession of his sister, Rose Mary Delaney. In his capacity as the attorney for the executor, respondent opened a succession checking account on which he was the sole signatory. Between October 2003 and December 2003, and again in September 2007, respondent wrote five checks on the account totaling $150,000, all payable to Extreme Auto Mart, the business run by Angela Spiers (see Count V,
 
 supra).
 
 According to the notations on the checks, these sums represented loans to Extreme Auto Mart. In October 2007, respondent borrowed $179,000 in succession funds to finance the purchase of a home for Ms. Spiers in Mississippi. The home was purchased in the name of Altus Group, Inc., a corporation of which respondent was the president. Respondent contends that Mr. Delaney was aware of and authorized the loans involving both Extreme Auto Mart |7and Altus Group; however, he acknowledges that he did not provide Mr. Delaney the opportunity to seek the advice of independent counsel in connection with the transactions. A significant portion of the
 
 *649
 
 loans have not been repaid to Mr. Delaney. Moreover, as of 2009, when the formal charges were filed, the Delaney succession was still open and no judgment of possession had been obtained.
 

 The ODC alleges respondent violated Rules 1.3, 1.4, 1.7(a), 1.8(a), 8.4(a), 8.4(b), and 8.4(c) of the Rules of Professional Conduct.
 

 Count X
 
 — The
 
 Title Insurance Matter
 

 Respondent handled real estate closings as part of his law practice. However, on April 30, 2007, respondent’s license to write title insurance lapsed. Thereafter, on May 11, 2007, respondent’s title insurance underwriter, First American Title Insurance Company (“FATIC”), notified him that it was terminating his Agency Agreement, effective thirty days from the date of the letter. Nevertheless, respondent continued to issue title insurance policies to clients for whom he handled closings. When FATIC was subsequently able to audit respondent’s files, it was discovered that a number of title insurance policies were lost or could not otherwise be accounted for. Although respondent signed lost policy affidavits for these policies, in some instances, it was later determined that policies described in the affidavits had in fact been issued.
 

 The ODC alleges respondent violated Rules 8.4(a), 8.4(b), and 8.4(c) of the Rules of Professional Conduct.
 

 Count XI
 
 — The
 
 Porter Matter
 

 This count of the formal charges relates to respondent’s handling of the succession of Richard Porter. The hearing committee concluded that the ODC did not prove the alleged misconduct by clear and convincing evidence, and the ^disciplinary board agreed with this finding. The ODC’s brief in this court does not object to this portion of the board’s recommendation, and accordingly, Count XI is not discussed herein.
 

 Count XII
 
 — The
 
 Millaudon Matter
 

 The following facts are not in dispute, having been stipulated to by the parties:
 
 [4]
 

 In July 2008, Clifford Millaudon retained respondent to represent his son, Paul Mil-laudon, in a domestic matter, paying him $1,750. After several continuances, a hearing was scheduled in the case for February 11, 2009. However, on February 4, 2009, respondent was placed on interim suspension. Respondent notified Mr. Mil-laudon of the suspension on February 9, 2009, when Mr. Millaudon telephoned him to inquire whether the hearing was still scheduled to take place on February 11th. Respondent has not refunded any portion of the $1,750 fee to Mr. Millaudon.
 

 The ODC alleges respondent violated Rules 1.4, 1.5(f)(5) (failure to refund an unearned fee), and 8.4(a) of the Rules of Professional Conduct.
 

 Count XIII
 
 — The
 
 Clark Matter
 

 The following facts are not in dispute, having been stipulated to by the parties:
 

 In August 2008, respondent was retained to represent Diane Clark in her divorce proceeding. Ms. Clark paid respondent $2,500 to handle the matter, which was scheduled for hearing on February 17, 2009. However, on February 4, 2009, ^respondent was placed on interim suspension. Respondent notified Ms. Clark of the suspension on February 16, 2009, the day before the hearing, and informed her that he could no longer handle her divorce. The hearing was subsequent
 
 *650
 
 ly continued to afford Ms. Clark the opportunity to retain other counsel. Respondent has not refunded any portion of the $2,500 fee to Ms. Clark.
 

 The ODC alleges respondent violated Rules 1.4, 1.5(f)(5), and 8.4(a) of the Rules of Professional Conduct.
 

 DISCIPLINARY PROCEEDINGS
 

 In September 2009, the ODC filed thirteen counts of formal charges against respondent, as set forth above.
 
 [5]
 
 Respondent answered the formal charges and admitted a few minor violations of the Rules of Professional Conduct, but otherwise denied any misconduct. The matter then proceeded to a formal hearing on the merits.
 

 Hearing Committee Report
 

 In its report, the hearing committee made the following findings based upon the evidence and testimony at the hearing:
 

 Count I:
 

 1. Respondent represented Beverly Anthony in connection with an automobile accident in which her son was injured. In February 2007, the case settled for $85,000. Respondent provided Ms. Anthony with a settlement statement reflecting that he had withheld funds to pay third-party healthcare providers who asserted valid liens, and he informed her that these liens would be paid within thirty days. However, respondent failed to timely remit the funds to 110the healthcare providers. Ms. Anthony then began to receive notices from the healthcare providers that the sums were not paid. She testified that she attempted to contact respondent on several occasions, but that her calls to him were never returned. The healthcare providers were ultimately paid in October 2007, more than eight months after the case was settled and after Ms. Anthony retained counsel to sue respondent over this issue.
 

 2. Respondent admitted that he failed to timely remit the withheld sums to the healthcare providers and that he had not been diligent in seeing to it that the payments were tendered. Respondent attributed the delay in payment to the activities of Angela Spiers, a client with whom he developed a personal, consensual sexual relationship and who became deeply involved in the daily operation of his law practice. Respondent admitted that he failed to supervise Ms. Spi-ers’ activities but denies any dishonesty, fraud, deceit, or misrepresentation under Rule 8.4 as charged in this count.
 

 8. The evidence established that in many respects, respondent’s client trust account was used like an operating account. Thus, he did not deposit into that account only monies in which a client or third person may have an interest. Respondent testified that Ms. Spiers had assumed responsibility for writing checks drawn on the trust account, although he signed the checks. The documentary evidence produced by the ODC established that shortly after the settlement proceeds were received and disbursed to Ms. Anthony and to respondent for his fee (but not to the healthcare providers), the balance in the trust account fell below the amount withheld to pay the healthcare providers. The ODC established that the funds owed to the
 
 *651
 
 healthcare providers were used for other purposes. Later, approximately $25,000 from Extreme Auto Mart (a business owned by Angela Spiers) was deposited into the trust account. These funds were apparently loaned to |^Extreme Auto Mart by the succession of Rose Mary Delaney (Count IX). This deposit provided sufficient funds for respondent to pay the healthcare liens in the Anthony matter in October.
 

 4. The ODC met its burden of proving violations of Rules 1.3, 1.4, 1.15(d), and 8.4(a). However, the evidence does not establish a knowing violation of Rule 8.4(c) or any intentional fraud or misrepresentation. Respondent violated duties owed to his client as a result of his complete and total abdication of the management of his client trust account (and indeed, most of his practice) to Ms. Spiers. That, however, does not excuse his conduct with respect to this count.
 

 5. Ms. Anthony sustained harm as a result of respondent’s violations. She testified that she received numerous phone calls from the healthcare providers who- had not been paid and that she was ultimately required to hire an attorney to file suit against respondent to compel him to pay the healthcare liens. She also testified that her credit rating suffered because of the delinquent amounts owed to the healthcare providers. As a result of the lawsuit, Ms. Anthony was awarded damages but not attorney’s fees,
 
 [6]
 
 which re-suited in her incurring attorney’s fees of over $8,000.
 

 Count II:
 

 1. Bobby and Linda Albin retained respondent to represent them with respect to a judgment debtor rule filed in Tangipahoa Parish based upon a judgment obtained against them in Winnfield City Court. A rule to show cause was issued by the 21st Judicial District Court and served on the Albins. The 112Albins agreed to pay $2,000 to respondent in order to secure his representation of them.
 

 2. Respondent obtained all of the pleadings from Winnfield City Court and communicated directly with counsel for the judgment creditor. This resulted in a continuance of the originally scheduled hearing date. However, respondent never formally enrolled as counsel for the Albins, and as a result, he did not receive notice of the rescheduling of the judgment debtor examination. Respondent failed to appear on the newly assigned date.
 

 3. Respondent did very little, if anything, to represent the Albins in this matter, other than, perhaps, securing a reassignment of the rule to show cause to a later date (the date on which he failed to appear). He thereafter did not communicate with the Albins concerning the nature of the proceedings themselves. As a consequence of respondent’s failure to enroll, and the resultant lack of notice to him of the resched
 
 *652
 
 uled hearing, the judgment debtor examination went on as re-scheduled without his participation and with the Albins being unrepresented by counsel.
 

 4. The Albins made demand upon respondent to return the fee paid by them, and they later filed a complaint with the ODC concerning respondent’s conduct. After the complaint was filed and while the ODC’s request to take respondent’s sworn statement was pending, respondent contacted the Albins and refunded one-half of the fee to them in exchange for them dismissing the complaint. Respondent admitted that he took this action and that he did not provide the Albins the opportunity to consult independent counsel, as required by Rule 1.8(h).
 

 5. While respondent generally admits these facts as recited, he pointed out to the committee that at the time of the rescheduled judgment debtor examination, he was in the courthouse in Amite and that the Albins did not | ^attempt to locate him there. He also notes that Mrs. Albin testified that she did not contact him when she received notice of the rescheduled hearing.
 

 6. The committee found respondent created the circumstances that resulted in his failure to obtain notice of the rescheduled hearing because he did not enroll as counsel for the Albins, something that is routine and that he could have done quite easily. It was not up to the Albins or to the court to ensure that respondent was notified of the new hearing date, particularly after he had been retained and accepted a $2,000 fee. Thus, respondent did not keep his clients informed about the status of the matter or act with reasonable diligence in connection with his representation of them.
 

 7. Following receipt of notice from the ODC that the Albins had filed a complaint, and just before his sworn statement was to be taken with respect to that complaint, respondent contacted the Albins in an attempt to resolve their dispute with him. He asked the Albins “what it would take” for them to dismiss their complaint. They responded that they wished to obtain a refund of one-half of the fee paid and in return would sign a letter directed to the ODC withdrawing the complaint. Respondent reimbursed the Albins one-half of the fee and they signed the letter. All of this was done by respondent without referring the Albins to independent counsel. The ODC contends that this action on the part of respondent violates Rule 1.8(h). On the other hand, respondent contends that Rule 1.8(h) is directed only to malpractice claims, not to disciplinary matters. He further contends that his agreement with the Albins did not preclude them from filing a malpractice action or seeking to obtain the balance of the fee paid pursuant to Rule 1.5.
 

 8. Although the language of Rule 1.8(h)(1) makes specific reference to claims for malpractice, and while subparagraph (2) of that rule makes reference to settlement of a claim or potential claim “for such liability,” the committee concluded that this rule applies with equal force to the settlement or withdrawal of disciplinary complaints and is not limited purely to civil actions by a client against the
 
 *653
 
 lawyer. Respondent intended to compromise a serious claim, albeit a disciplinary complaint, without affording the Albins an opportunity to seek independent counsel concerning this action. Moreover, respondent’s contention that the “release” by the Albins “settled nothing” rings hollow. Clearly, any fee dispute between the Albins and respondent was compromised by the agreement.
 

 9. As to the harm sustained by the Albins, it is unclear whether respondent could have mounted a successful defense to the judgment debtor examination. Nevertheless, the Albins paid respondent a net of $1,000 and got very little in return. In addition, they were forced to proceed without representation at the scheduled hearing. Thus, the committee concluded the Albins sustained harm as a result of respondent’s conduct.
 

 10. Accordingly, the ODC proved by clear and convincing evidence a violation by respondent of Rules 1.3, 1.4,1.8(h), and 8.4(a).
 

 Count III:
 

 1. In May 2006, respondent was retained by Diane Arbo to handle the succession of her mother. Respondent charged a $1,500 flat fee for the services required to complete this engagement, which Ms. Arbo paid. Eventually, as a result of respondent’s failure to file pleadings with respect to the succession or to return her telephone calls, Ms. Arbo terminated respondent and hired another attorney to complete the succession. She made a request to respondent to refund a portion of the fee paid. He refused to refund any of the fee for the work for which he was retained, nor did he put any portion of the fee into his trust account pending resolution of the fee dispute with his client.
 

 11S2. Apparently, this succession became more complicated than what respondent initially anticipated, at least from his perspective. Ms. Arbo testified that she made repeated attempts to get in touch with respondent, including phone messages and faxed documents, but that she received no response. These attempts spanned a period from May 2006 until March 2007, when Ms. Arbo ultimately advised respondent that his services were no longer required and that she had retained new counsel. Ms. Arbo further testified that respondent contacted her in July 2008, whereupon there was a discussion about returning a portion of the fee. Initially, in March 2008, respondent took the position that he would not refund any money to Ms. Arbo, but in fact, he did refund some of the fee in July 2008. Ms. Arbo filed her complaint with the ODC in February 2008.
 

 3. However, as in the case of the Albin matter (Count II), prior to the ODC’s taking his sworn statement, respondent met with Ms. Arbo and refunded one-half of the fee in consideration for which Ms. Arbo agreed to withdraw the complaint, again without the disclosures required by Rule 1.8. Respondent wrote the “withdrawal letter” for Ms. Arbo’s signature and returned one-half of the fee she had paid. Respondent admitted that he did not advise Ms. Arbo that she had the right to seek independent counsel before agreeing to withdraw the complaint. In this particular instance, Ms. Arbo testified that, had she been informed of her right to
 
 *654
 
 seek additional counsel, she might have done so.
 

 4. Insofar as respondent’s diligence in this matter, it appears he did undertake a significant amount of the work that was required. Thus, the ODC did not prove a violation of Rule 1.3. However, it is equally clear that respondent failed to communicate with Ms. Arbo regarding the succession or to consult with her regarding any additional work that may have been required to | incomplete it, and thus he violated Rule 1.4. The failure to respond to Ms. Arbo’s telephone calls was attributed by respondent to the interference in his practice of Angela Spi-ers, but that does not reheve him of his professional responsibility to Ms. Arbo.
 

 5. For the reasons described in the committee’s findings with respect to the Albin matter, respondent’s actions in seeking a withdrawal of the disciplinary complaint in exchange for a refund of one-half of the fee paid by Ms. Arbo constitutes a violation of Rule 1.8(h).
 

 6. Ms. Arbo sustained harm in that she endured a delay in the completion of her mother’s succession, was forced to engage another lawyer to complete the succession, and paid a fee for which she did not receive the services (i.e., the completed succession) that respondent had contracted to provide.
 

 Count TV:
 

 1.Respondent was retained to represent the executor of the succession of Morris Overton. In connection with his representation, respondent opened a checking account at First American Bank designed to hold and transfer funds belonging to the succession and to pay succession debts. Curiously (but as was apparently a common practice of respondent in succession matters), the executor was not the person authorized to transact business on the account and had no authority to sign checks drawn on the account; respondent was designated as the sole person authorized to do so.
 

 2. On October 11, 2005, respondent made a personal loan at First American Bank. As collateral for the loan, respondent pledged the Over-ton succession account, funds which admittedly did not belong to him and for which he had fiduciary responsibility consistent with his representation of the executor. Respondent did not ask permission of nor tell his client that he had pledged the succession funds to secure his personal debt. Respondent admits these |17facts but testified that he indicated to the banker responsible for the loan that the pledged funds belonged to the succession of Morris Overton and that the banker still agreed to and accepted the pledge of that account as security. To the extent that respondent suggests the bank’s consent to the pledge is a defense to his action, the committee expressly rejected his contention.
 

 3. Thus, there are no facts at issue regarding respondent’s actions. The only question for the committee was whether respondent’s conduct violates the rules charged, namely Rules 1.8(a), 8.4(a), and 8.4(c).
 
 [7]
 

 
 *655
 
 4. In response to the contention that he violated Rule 1.8(a), respondent argues that he did not “technically” acquire an ownership, possessory, security, or other pecuniary interest in the client’s property. The committee disagreed. As a practical matter, in pledging the client’s funds to secure a personal debt, respondent effectively “borrowed” the funds (or at least the right to pledge the funds) from his client. Doing so without the consent of the client appears to be a clear violation of Rule 1.8(a). The fact that the loan was repaid and that the funds pledged were never seized by the bank is of no moment. The violation occurred when the pledge was executed.
 

 5. The committee found it particularly curious that respondent appears to have routinely opened succession accounts and retained signature authority over the account to the exclusion of the succession representative. While the legality of such an arrangement was not before the committee, it noted it was beyond dispute that the arrangement permitted respondent an unfettered ability to pledge the funds. Respondent was the sole person in control of the account.
 

 |1S6. Moreover, by failing to advise the succession representative that the pledge had occurred, respondent misrepresented to his client the status of the succession account and the use of estate funds. In doing so, he violated Rules 1.8(a), 8.4(a), and 8.4(c).
 

 7. The client was harmed because the funds pledged were in jeopardy of seizure by the bank. Thus, the pledge of these funds was more than just an academic or technical exercise. According to the documentary exhibits and testimony, respondent was delinquent on this loan at least once and no principal reduction occurred on the loan until at some point following the notice to respondent that the ODC was investigating his actions with respect to this transaction.
 

 Count V:
 

 1. Angela Spiers was respondent’s client for a number of years. At one time, she owned Extreme Auto Mart, a used car business in Tangi-pahoa Parish. Respondent represented Ms. Spiers and the business in connection with a number of transactions. In 2004, respondent and Ms. Spiers began a consensual sexual relationship. This occurred at a time when respondent was still actively representing Ms. Spiers. Respondent did not withdraw from the representation of Ms. Spiers or of her business. The relationship with Ms. Spiers not only created apparent conflicts of interest between respondent and her, it permitted Ms. Spiers to become deeply involved in the daily operation of respondent’s law practice and adversely affected a number of his other professional relationships.
 

 2. For example, for all intents and purposes, Ms. Spiers took over the administration of respondent’s law practice. She refused to convey messages to respondent from his clients. She also actively managed and controlled respondent’s trust account and was partially responsible for the |igdelay in making payments to the healthcare providers in the
 
 *656
 
 Anthony matter (Count I). Her refusal to convey messages from Diane Arbo contributed materially to respondent’s failure to adequately communicate with Ms. Arbo when he represented her (Count III). Ms. Spiers’ influence and her control of respondent’s practice became so pervasive that the office management fell into near total disarray.
 

 3. The bookkeeping and accounting practices which respondent permitted Ms. Spiers to control resulted in some of the problems seen in Count X, the title insurance matter. However, perhaps the most significant evidence of Ms. Spiers’ impact on respondent’s law practice is seen in Count IX. In that matter, respondent induced Mr. Delaney, in his capacity as the executor of his sister’s succession, not only to “invest” in Extreme Auto Mart but also to loan a substantial amount of money to Ms. Spiers so that she could purchase a residence in Mississippi. Respondent’s principal motivation for this transaction was to get Ms. Spiers out of his life after their relationship soured; it had nothing to do with Mr. Delaney’s best interests.
 

 4. The committee agreed generally with respondent that his consensual sexual relationship with Ms. Spiers did not adversely affect his independent judgment in advising her regarding either her personal legal affairs or those of Extreme Auto Mart.
 
 [8]
 
 However, the relationship between respondent and Ms. Spiers greatly affected his relationship with other clients. Specifically, money advanced to Extreme Auto Mart as an “investment” by the succession of Rose Mary Delaney was precipitated, at least in part, by respondent’s desire to advance the interests of one client (Extreme AutoJ^Mart) at the expense of another (the Delaney succession), and probably to make up for a shortfall in respondent’s trust account. Those funds found their way to the trust account and were used, in part, to pay the healthcare providers in the Anthony matter (Count I).
 

 5. Moreover, respondent’s relationship with Ms. Spiers led to her assuming inordinate authority and power over his law practice, and directly led to the disputes with Ms. Anthony, Ms. Arbo, and FATIC.
 

 6. By placing the interest of Ms. Spiers and his relationship with her above the interests of his other clients, respondent violated Rules 1.7(a) and 8.4(a).
 

 Count VI:
 

 1. Respondent executed a power of attorney that enabled him to mortgage property he co-owned with his brother Albert in Tangipahoa Parish. The power of attorney was executed by respondent both in his capacity as agent and also as principal. In other words, respondent executed a power of attorney naming himself as agent for his brother, but without Albert’s knowledge or consent. Respondent contends this was perfectly legal and based on a prior power of attorney (admittedly authorized by Albert) which appointed respondent
 
 *657
 
 as agent for Albert, which respondent contended authorized him to execute any and all documents necessary to carry out his agency (including executing the second power of attorney). The initial, admittedly valid, power of attorney did not expressly authorize respondent to appoint any other agents or to execute any additional powers of attorney.
 

 2. Respondent’s conduct in executing a power of attorney appointing himself as agent for his brother in order to complete a real estate transaction that was beneficial to respondent was improper and, at the very least, deceptive. (Respondent admitted that he did not inform his brother that he had executed this second power of attorney.)
 

 JaiS. The committee concluded that the language in the first power of attorney which authorized respondent to execute any and all documents required to exercise the authority granted in that power of attorney (the basis upon which respondent argues that he validly executed the second power of attorney) is not so broad. Respondent could have easily requested of his brother an additional power of attorney. That fact, coupled with respondent’s admission that he did not inform his brother about the transaction involving the property they co-owned (and for which the power of attorney was required) strongly indicated to the committee that respondent’s actions in executing and using the power of attorney were, at the least, deceptive, and thereby violated Rule 8.4(c).
 

 4. The committee found potential harm to Albert occurred by virtue of respondent’s use of the second power of attorney in a real estate transaction of which Albert had no knowledge. The committee did not find that Albert sustained any direct economic loss as a result of that transaction, however.
 

 Count VIII:
 

 1. Respondent performed the title work required for his client, Mr. Pe-terman, to use property in Tangipa-hoa Parish as collateral for a bank loan. Respondent issued a title policy providing coverage to the bank as mortgagee.
 

 2. It is clear that respondent issued the policy after his Louisiana title agent’s license to do so had expired.
 

 Count IX:
 

 1. In this count, the ODC alleges that respondent improperly induced a client, Louis Delaney, who was the surviving legatee and executor of the estate of his deceased sister Rose Mary, to invest money in Extreme Auto Mart, the entity owned by Angela Spiers. Moreover, succession funds were advanced | ⅞¾⅛ Altus Group, Inc., another entity in which respondent had an ownership interest, so that Ms. Spiers could purchase a residence in the State of Mississippi. In this instance, as was apparently respondent’s custom, he opened an account for the succession, but retained signature authority himself as opposed to vesting it in the succession representative.
 

 2. Mr. Delaney testified at the disciplinary hearing. He appeared to the committee to be a relatively unsophisticated gentleman who unexpectedly inherited a large estate from his sister. Persuaded by respondent that an investment in Extreme Auto Mart would provide a reasonable return, Mr. Delaney
 
 *658
 
 agreed to loan the business a substantial sum of money.
 

 3. The ODC contends that at the time respondent induced his client to invest in Ms. Spiers’ business, respondent was also an officer of the corporation. Whether respondent was actively involved in Ms. Spiers’ business is unclear, but the documents introduced by the ODC indicate that respondent was, in fact, an officer and director of Extreme Auto Mart during the times relevant to this count.
 

 4. Respondent testified that he believed the investment would provide a return to Mr. Delaney. He also candidly admitted that one of the principal motivations in his approaching Mr. Delaney about the investment and the loan by which the Mississippi residence was purchased was that it presented an opportunity to remove Angela Spiers from his life. By providing an investment to her business and advancing additional money to purchase a residence for Ms. Spiers, such actions would not only move her out of respondent’s law office and home, but out of the State of Louisiana.
 

 5. The committee concluded that respondent used his fiduciary relationship with Mr. Delaney to foster his own personal motives, failed to disclose the romantic and business relationship he had with Ms. Spiers, and, thus, misled | ⅜. Delaney into loaning money to Ms. Spiers’ business and to purchase the real estate in Mississippi. Ms. Spiers defaulted on those obligations fairly quickly, leaving Mr. Delaney to engage counsel in Mississippi and undertake foreclosure proceedings in that state. Mr. Delaney now finds himself as the owner of as-yet unsold real estate in Mississippi. The investment never produced a return of any kind, but did cause Mr. Delaney to incur costs in terms of loss of income attributable to the principal loan to Ms. Spiers, attorney’s fees, and costs. The total amount of this loss is yet to be determined.
 

 6.From the testimony of Mr. Delaney, the documentary evidence submitted by the ODC, and the testimony of respondent himself, the committee concluded that the ODC met its burden of proving by clear and convincing evidence that respondent violated Rules 1.3, 1.4, 1.7(a), 1.8, 8.4(a), and 8.4(c) with respect to this count. The committee did not find respondent committed a criminal act in violation of Rule 8.4(b).
 

 Count X:
 

 1. Respondent was a long-time title insurance agent for FATIC. This required him to be licensed as such by the Louisiana Department of Insurance. As a result of the activities in his office involving Angela Spiers, which included poor bookkeeping, poor accounting, and a lack of an audit trail for some of the title policies issued by respondent, FATIC desired, but was unable to conduct, a comprehensive audit of the policies issued by respondent. In fact, Ms. Spiers deflected and delayed numerous attempts to conduct the audit.
 

 2. When FATIC was ultimately able to conduct its audit, it determined that a number of policies were lost or could not be accounted for. Respondent ultimately signed lost policy affidavits. In some instances, it was later determined that the policies described in the affidavit(s) had in fact been |24issued. Despite this evi
 
 *659
 
 dence, no FATIC representative could testify that, as a result of respondent’s actions or inactions, FATIC had lost any money or that premiums pertaining to any policy had not been collected and remitted to FATIC as required. However, as a result of the FATIC audit, respondent was advised that he would no longer be recognized or sponsored as a FATIC title agent, but that he would be permitted to complete any “work in progress” after the effective date of his termination. Thus, at the end of the day, FATIC had no real complaint regarding respondent’s agency except for his inability to maintain adequate records and for the delay in its ultimately performing an audit. It suffered no economic loss that it could identify.
 

 3. In the meantime, respondent’s license to write title insurance, issued by the Louisiana Department of Insurance, expired in the ordinary course of business. (All such licenses are renewed annually.) Notwithstanding that FATIC had authorized respondent to conclude any work in progress after it -withdrew his authorization to serve as a FATIC agent, the evidence clearly established that several policies were issued by respondent after his Louisiana title agent’s license had expired. During the hearing, the ODC produced representatives of the Louisiana Department of Insurance who testified regarding the procedure by which title insurance agents are notified of the pending expiration of their licenses so they can be timely renewed. The procedure involves mailing a renewal notice to the title agent’s address of record. The renewal itself is a relatively simple process that involves paying an annual fee. Representatives of the Department of Insurance further testified that it is a violation of Title 22, punishable as a criminal offense, to issue title insurance policies without being properly licensed by the Department.
 

 [¾⅞4. Respondent testified that he could not remember receiving a renewal notice,
 
 [9]
 
 and it was not possible for the Department of Insurance to prove specifically that a notice had been mailed to and/or received by him. However, the committee concluded it was more probable than not that the Department of Insurance had followed its normal procedure in connection with respondent’s license renewal and that respondent had simply failed to timely renew his title agent’s license.
 

 5. The committee reviewed the relevant statutes and found that the testimony of the Louisiana Department of Insurance representatives regarding the failure of respondent to renew his title agent’s license, as compared to the dates on which a number of FATIC insurance policies were issued, establishes by clear and convincing evidence that respondent violated Louisiana law and subjected himself to a criminal penalty by issuing title insurance policies when he was not properly licensed to do so. Thus, the committee found the ODC proved by clear and convincing evidence that respondent violated Rules 8.4(b) and 8.4(c) of the Rules of Professional
 
 *660
 
 Conduct. The committee did not find a violation of Rule 8.4(a).
 

 Counts XII and XIII:
 

 1. The ODC contends that respondent agreed to represent Mr. Millaudon (Count XII) and Ms. Clark (Count XIII) in domestic relations matters and accepted a fee of $1,750 from Mr. Millaudon and $500 from Ms. Clark. However, before either client’s matter could be heard, respondent was placed on interim suspension. To date, he has not refunded any part of the fee to either client. Respondent acknowledges that he failed to do so and testified that he does not have the financial ability to make the refunds.
 

 |2(i2. The ODC further contends that respondent did not timely advise either client of the fact that he was suspended or keep them reasonably notified regarding the status of the respective matters, principally because he failed to provide notice to either client well in advance of the scheduled court appearances that he had been suspended and would not be permitted to continue his responsibilities to them. Based on respondent’s testimony, the committee found the ODC met its burden of proving by clear and convincing evidence that respondent violated Rules 1.4, 1.5(f)(5), and 8.4(a) in these counts.
 

 Based upon these findings, the committee determined that respondent violated duties principally owed to his clients. He failed to properly handle the funds withheld to pay healthcare providers in the Anthony matter, failed to properly enroll or to appear on behalf of his clients in the Albin matter, failed to complete the succession work undertaken by him in the Arbo matter, improperly pledged client funds to secure a personal debt in the Overton matter, used his relationship with Angela Spiers to adversely affect his client in the Delaney matter, and failed to timely advise his clients of his interim suspension in the Millaudon and Clark matters. He improperly compromised fee disputes and obtained withdrawals of ethical complaints in violation of Rule 1.8. In addition, respondent violated a duty owed to the legal profession when he executed an unauthorized power of attorney in the Emilie Yo-kum succession, and to the public in failing to timely renew his Louisiana title agent’s license.
 

 Considering the evidence as a whole, the committee did not find that respondent acted intentionally to harm his clients or to breach any duties owed to them. However, respondent did act knowingly in pledging client funds to secure a private debt in the Overton matter and knowingly induced Mr. Delaney to lend money to Extreme Auto Mart and to Ms. Spiers in connection with the Delaney succession. In the remaining instances in which misconduct was found, the 127committee determined respondent acted negligently (and in some instances, in a grossly negligent fashion).
 
 [10]
 

 In each of the circumstances in which a violation of the Rules of Professional Conduct has been found, some harm was real
 
 *661
 
 ized by the affected client. For example, in the Anthony matter, Ms. Anthony was required to hire an attorney at considerable expense to pursue a claim against respondent to force him to pay healthcare liens for which he had unquestionably retained client funds. In the Albin matter, the clients paid respondent a fee and got essentially no services in return. In the Arbo matter, Ms. Arbo was required to hire another attorney and incur additional legal expenses as a result of respondent’s failure to complete the representation he undertook and for which he accepted a fee. With respect to the pledge of succession funds in the Overton matter, while it is true that there was no ultimate financial loss to the client, there was, at least, the potential for loss had respondent defaulted on his personal loan. In connection with the Delaney matter, the actions of respondent caused clear damage to Mr. Delaney, as legatee of the succession of his sister, in an amount that has not yet been determined.
 
 [11]
 
 Finally, fees were paid and not refunded in both the Millaudon and Clark matters, and no services were performed for either client by virtue of respondent’s interim suspension.
 

 The committee found the following aggravating factors are present: a dishonest or selfish motive (only as to Count IX, in which respondent induced Mr. |2SPelaney to advance money to Angela Spiers), a pattern of misconduct, multiple offenses, and substantial experience in the practice of law (admitted 1966). In mitigation, the committee recognized the following factors: absence of a prior disciplinary record, absence of a dishonest or selfish motive (except as to Count IX), full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, and character or reputation. The committee also noted that respondent “generally acknowledged the wrongful nature of his conduct, even though he attempted to excuse much of it.”
 

 Considering the foregoing findings, the committee recommended respondent be disbarred. The committee further recommended that respondent be required to meet specified conditions prior to seeking readmission.
 
 [12]
 

 Both respondent and the ODC filed objections to the hearing committee’s report.
 

 Disciplinary Board Recommendation
 

 After reviewing the record of this matter, the disciplinary board found the hearing committee’s factual findings are supported by the record and are not manifestly erroneous, with a few minor exceptions. The board also generally agreed with the committee’s determinations regarding the alleged violations of the Rules of Professional Conduct. In Count VIII, the board expressly found that respondent violated Rules 8.4(b) and 8.4(c) by issuing a title insurance policy in the Peterman matter after his insurance license lapsed. The board also found that respondent violated Rule 8.4(a) by violating the Rules of Professional Conduct as discussed in its report.
 

 12f)The board determined respondent violated duties owed to his clients and to the profession. The board found respondent’s
 
 *662
 
 conduct was negligent, knowing, and intentional, and caused actual harm. Relying on the ABA’s
 
 Standards for Imposing Lawyer Sanctions,
 
 the board determined the applicable baseline sanction in this matter is disbarment.
 

 The board found the following aggravating factors are present: a dishonest or selfish motive (as to Counts IV, VI, and IX), a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victim (as to Count IX), and substantial experience in the practice of law. In mitigation, the board recognized the following factors: absence of a prior disciplinary record, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, and character or reputation.
 

 Considering the egregious nature of respondent’s misconduct, the board recommended he be permanently disbarred. The board also recommended that respondent be required to make restitution in the Delaney matter and to refund the unearned fees owed to Mr. Millaudon and Ms. Clark. Finally, the board recommended that respondent be assessed with all costs and expenses of these disciplinary proceedings. One board member dissented and would recommend disbarment.
 

 Respondent filed an objection to the disciplinary board’s report and recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
 

 DISCUSSION
 

 Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has lapbeen proven by clear and convincing evidence.
 
 In re: Banks,
 
 09-1212 (La.10/2/09), 18 So.3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See
 
 In re: Caulfield,
 
 96-1401 (La.11/25/96), 683 So.2d 714;
 
 In re: Pardue,
 
 93-2865 (La.3/11/94), 633 So.2d 150.
 

 In a thorough report, the hearing committee made numerous and specific factual findings to lend support to its determination that respondent failed to communicate with clients, neglected legal matters, failed to refund unearned fees, engaged in conduct constituting conflicts of interest, failed to timely pay third-party medical providers, committed a criminal act, and engaged in dishonest and deceitful conduct. The disciplinary board generally accepted the committee’s findings and concluded that respondent violated numerous Rules of Professional Conduct. We agree that these findings are well supported by the voluminous record of this matter.
 

 Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct.
 
 Louisiana State Bar Ass’n v. Reis,
 
 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances.
 
 Louisiana State Bar Ass’n v. Whittington,
 
 459 So.2d 520 (La.1984).
 

 The record demonstrates that respondent’s conduct was negligent and knowing,
 
 *663
 
 and caused both actual and potential harm. The applicable baseline sanction in this matter is disbarment.
 

 |R1In mitigation, respondent has no prior disciplinary record in more than forty-five years of practicing law. He has been extremely cooperative throughout these proceedings, has demonstrated remorse, and has a good reputation in the community where he resides and maintains his law office. Respondent has also begun making restitution to his clients, including Mr. Delaney, who is owed a significant sum in connection with the loans to Ms. Spiers. These numerous mitigating factors clearly outweigh the aggravating factors present and justify a downward deviation from disbarment.
 

 Under the circumstances, we find the appropriate sanction in this matter is a three-year suspension from the practice of law, which shall be retroactive to the date of respondent’s interim suspension. We will also order respondent to make restitution in the Anthony and Delaney matters, and refund the unearned fees owed in the Millaudon and Clark matters.
 

 DECREE
 

 Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Leonard E. Yokum, Jr., Louisiana Bar Roll number 13745, be and he hereby is suspended from the practice of law for a period of three years, retroactive to February 4, 2009, the date of his interim suspension. It is further ordered that respondent pay restitution to Beverly Anthony and Louis Delaney, and refund the unearned fees owed to Clifford Millaudon and Diane Clark. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
 

 [1]
 

 . The record reflects that respondent incorporated Extreme Auto Mart and served as an officer and director. In 2004, respondent transferred twenty-five shares of the company's stock to Ms. Spiers, but according to his own testimony, he retained an interest in the company at least as late as 2008.
 

 [2]
 

 . The formal charges originally alleged other violations by respondent in handling his mother’s succession. The hearing committee concluded that the ODC did not prove this other misconduct by clear and convincing evidence, and the disciplinary board agreed. The ODC’s brief in this court does not object to the board’s findings in this regard, and accordingly, these issues are not discussed herein.
 

 [3]
 

 . The formal charges originally alleged other violations by respondent in handling Mr. Pe-terman’s legal matter. The hearing committee concluded that the ODC did not prove this other misconduct by clear and convincing evidence, and the disciplinary board agreed. The ODC's brief in this court does not object to the board’s findings in this regard, and accordingly, these issues are not discussed herein.
 

 [4]
 

 . Prior to the hearing on the formal charges, the ODC and respondent stipulated to the underlying facts alleged in Counts XII and XIII. However, respondent did not agree that these facts constituted violations of the Rules of Professional Conduct, as alleged by the ODC.
 

 [5]
 

 . At the direction of the hearing committee, the ODC twice amended the formal charges in order to correct substantive and typographical errors in its filing.
 

 [6]
 

 . Respondent appealed the judgment rendered in favor of Ms. Anthony, and that appeal was pending at the time of the hearing before the hearing committee. On May 6, 2011, the court of appeal affirmed the judgment against respondent in an unpublished opinion.
 
 Anthony v. Yokum,
 
 10-0487 (La.App. 1st Cir.5/6/11), 66 So.3d 81.
 

 [7]
 

 . In some instances, the committee’s report erroneously refers to Rule 1.8(h); the rule at issue in this count is 1.8(a).
 

 [8]
 

 . We note that in prior cases, this court has held that a violation of Rule 1.7 occurs when a lawyer engages in a consensual sexual relationship with a client, regardless of whether the conflict of interest caused actual harm to the client.
 
 See, e.g., In re: Ryland,
 
 08-0273 (La.6/6/08), 985 So.2d 71.
 

 [9]
 

 . The committee noted that as with many other deficiencies in his practice, respondent suggests that Angela Spiers may have simply failed to call the renewal notice to his attention.
 

 [10]
 

 . The committee acknowledged that many (but certainly not all) of these violations occurred as a direct result of respondent's personal involvement with Ms. Spiers. Even by respondent’s own testimony, her influence on his practice was pervasive. She effectively took control of respondent's law firm, including the access of clients to respondent and the management of the trust account, to the point that respondent was not exercising independent judgment or control over his practice. As respondent has generally admitted, however, the situation with Ms. Spiers does not relieve him from ultimate responsibility for these actions.
 

 [11]
 

 . The committee observed that the loans to Extreme Auto Mart have not been and are likely never to be repaid. Similarly, the loan to Ms. Spiers to purchase the house in Mississippi will cause Mr. Delaney some damages if and when the house is sold following foreclosure proceedings there.
 

 [12]
 

 . These conditions included the payment of restitution to Louis Delaney; return of the fees paid by Mr. Millaudon and Ms. Clark; attendance at the Louisiana State Bar Association's Trust Accounting School; monitoring of respondent's client trust account; and payment of all costs of these proceedings.